# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | Crim. No. 89-160-1 (RCL) |
| | § | |
| MARCOS ANDERSON, | § | **FILED** |
| Defendant. | § | |
| | § | APR - 8 2010 |
| | § | |

U.S. DISTRICT COURT

## MEMORANDUM OPINION

Before this Court is defendant Marcos Anderson's Petition to Vacate, Modify or Correct Sentence under 28 U.S.C. § 2255. Having considered Mr. Anderson's motion, the opposition by the United States, the replies thereto, and the oral arguments of counsel, the petition to modify his sentence is denied for the reasons set forth below.

### I. INTRODUCTION

Between 1988 and 1989 Marcos Anderson ran a large-scale drug ring centered in Washington, D.C. On May 12, 1989 a 126-count indictment was returned against Mr. Anderson and thirty others. Mr. Anderson was charged with conspiracy, continuing criminal enterprise, distribution of controlled substances, possession with intent to distribute controlled substances, interstate travel in aid of racketeering, unlawful use of a communication device, and use of a firearm during a drug trafficking offense. At trial, the

jury found Mr. Anderson guilty on all counts of the indictment. Mr. Anderson was sentenced to concurrent terms of 405 months for the conspiracy, continuing criminal enterprise, distribution of controlled substances, and possession with intent to distribute controlled substances counts, 60 months on the interstate travel in aid of racketeering counts, and 48 months on the unlawful use of a communication device counts. Mr. Anderson was sentenced to 60 months on each of the four firearm counts, each to run consecutively.

After his first trial, Mr. Anderson appealed his conviction and the D.C. Circuit affirmed, but remanded the case for resentencing as it found the sentences for conspiracy and continuing criminal enterprise to be cumulative. *United States v. Anderson*, 39 F.3d 331 (D.C. Cir. 1994). Rehearing *en banc* was granted by the Court of Appeals to reconsider Mr. Anderson's consecutive sentences for the firearms counts and the opinion in *Anderson I* was vacated. 39 F.3d 361 (D.C. Cir. 1995). Upon rehearing *en banc* the Court of Appeals reversed three of the four firearms convictions and remanded for resentencing. *United States v. Anderson*, 59 F.3d 1323 (D.C. Cir. 1995). Upon remand the district court resentenced Mr. Anderson to concurrent sentences of 364 months on the continuing criminal enterprise count, distribution of controlled substances count, and possession with intent to distribute controlled substance count; he also received another concurrent sentence of 60 months for interstate travel in aid of racketeering, and another concurrent 27 months for unlawful use of a communication facility.

Mr. Anderson was given a 60 month consecutive sentence on the remaining firearms count. Mr. Anderson lodged his third appeal and the Court of Appeals affirmed his conviction and sentences. *United States v. Anderson*, 172 F.3d 921 (D.C. Cir. 1998) (Table Op.). Mr. Anderson then petitioned for certiorari, which was denied on January 25, 1999. 119 S. Ct. 918 (1999). On January 24, 2000, Mr. Anderson timely filed a petition to vacate, modify or correct his sentence under 28 U.S.C. § 2255.

In his 2255 petition Mr. Anderson makes three sets of claims. The first set of claims is based on allegedly deficient jury instructions. The petition asserts that the jury instructions regarding the continuing criminal enterprise count were defective in light of *Richardson v. United States*, 526 U.S. 813 (1999), as the court failed to instruct the jurors that they had to agree unanimously as to which offenses formed the predicate offenses necessary to find that the defendant violated 21 U.S.C. § 848. He further argues that the instructions were defective as the court failed to require that the jurors agree that the predicate offenses needed to be related to one another in order to constitute a continuing criminal enterprise. Mr. Anderson also argues that jury had to unanimously agree on the identities of the five persons he supervised.

In his second set of claims Mr. Anderson alleges that he received ineffective assistance of counsel regarding the difference in sentence exposure between going to trial and pleading guilty. Had he been correctly informed of

3

the difference, Mr. Anderson says he would have pleaded guilty. Finally, Mr. Anderson contends that his resentencing for possession with intent to distribute controlled substances violated the ex post facto clause, as the court considered information beyond the indictment, which would not have been permitted under the guidelines at the time of his original sentence.

## II. ANALYSIS

### A. *Richardson* Claims

Mr. Anderson was indicted for violating 21 U.S.C. § 848, which establishes criminal liability for conducting a "continuing criminal enterprise." A person is engaged in a continuing criminal enterprise if he gains substantial income or resources from violating any felony drug law as part of a continuing series of violations of felony drug laws in concert with five or more persons whom he supervised. 21 U.S.C. § 848(c).

The jury was instructed that the government, as part of its burden, needed to prove beyond a reasonable doubt that "Marcos Anderson committed a series of three or more violations of the federal drug laws. . . ." *Motion* at 5 (quoting Tr. Vol. XXXIX at 103–08). Though he did not raise the issue at trial, on his direct appeal Mr. Anderson argued that the jury instructions were deficient because they did not require the jury to unanimously agree on the identities of those persons whom Mr. Anderson supervised or which predicate offenses made up part of the "continuing series of violations." The D.C. Circuit rejected both of these arguments. *United States v. Anderson*, 39

4

F.3d 331, 350–51 (D.C. Cir. 1994) (hereinafter *Anderson I*), *vacated* 39 F.3d 361 (D.C. Cir. 1995). In his 2255 motion, Mr. Anderson raises, for the first time, a claim that the jury instructions were also deficient as they failed to require the jury to find that the predicate offenses were related to one another.

### i. *Juror Unanimity as to Predicate Offenses*

Since Mr. Anderson's appeals, though before he filed his 2255 petition, the Supreme Court decided *Richardson v. United States*, 526 U.S. 813 (1999). *Richardson* resolved a circuit split as to whether a jury had to unanimously agree as to which predicate offenses make up the "continuing series of offenses." *Id.* at 816. The Supreme Court concluded that a jury was required to unanimously agree which predicate violations make up the continuing series of violations. *Id.* There is no dispute that the instructions in Mr. Anderson's case do not comply with *Richardson*.[1] The only question is: what effect does this error have?

Since *Richardson* was decided, several courts have determined, and the parties seem to agree, that the decision applies retroactively to cases on collateral review. *See, e.g., United States v. Dago*, 441 F.3d 1238, 1243 (10th Cir. 2006); *Ross v. United States*, 289 F.3d 677, 682 (11th Cir. 2002);

---

[1] It is worth noting that the instructions in *Richardson* were actually more prejudicial than those in Mr. Anderson's case as the trial judge in *Richardson* explicitly instructed the jury that they did not have to agree which particular violations make up the predicate offenses, whereas here the trial court merely failed to instruct jurors that they had to unanimously agree which violations made up the predicate offenses. *See Richardson*, 526 U.S. at 816.

*Santana-Madera v. United States*, 260 F.3d 133, 139 (2d Cir. 2001); *United States v. Lopez,* 248 F.3d 427, 432 (5th Cir. 2001); *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000). As Mr. Anderson timely filed his 2255 petition, *Richardson* also applies to his case.

In *Richardson,* the Supreme Court left undecided what standard of review to apply on remand, *id.* at 824, and the Seventh Circuit disposed of the case without deciding the issue by remanding to the district court for vacatur of Richardson's CCE conviction, a solution it found attractive as the defendant's conviction for conspiracy had been undisturbed, *United States v. Richardson*, 195 F.3d 316, 317 (7th Cir. 1999). Other courts confronted with a *Richardson* problem have applied harmless error review.[2] *See, e.g., Ross,* 289 F.3d at 681–82; *Murr,* 200 F.3d at 906; *United States v. Escobar de Jesus,* 187 F.3d 148, 161–62 (1st Cir. 1999) (citing *Neder v. United States,* 527 U.S. 1 (1999)).

---

[2] This circuit has not had occasion to determine what standard of review is appropriate in reviewing *Richardson* claims. The Court notes, however, that the D.C. Circuit has held that where a jury instruction is not objected to at trial, as in this case, it should be subject to plain, rather than harmless, error review. *United States v. Wilson,* 240 F.3d 39, 44–45 (D.C. Cir. 2001); *see* Fed. R. Crim. P. 51 ("A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.") *and* Fed. R. Crim. P. 42(b) (" A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *see also Puckett v. United States,* 129 S. Ct. 1423, 1428 (2009). Normally, this would make one think that this Court should subject Mr. Anderson's claims to plain error analysis. This is not the case, however, as there is a distinction between harmless error analysis on direct review and harmless error analysis on collateral review. As *Wilson* involved review of an unobjected-to jury instruction on direct review, the Court does not think that it is controlling.

6

Harmless error, of course, has more than one meaning. In *Brecht v. Abrahamson*,[3] the Supreme Court held that a defendant is entitled to habeas relief when he demonstrates that a non-structural constitutional error "had a substantial or injurious effect [on] determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). The competing harmless error standard was enunciated in *Chapman v. California*, where the Court said that a constitutional error must be held "harmless beyond a reasonable doubt" in order for it to be left unredressed. 386 U.S. 18, 24 (1967). *Chapman* is still the correct standard for constitutional errors, objected to at trial, and raised on appeal. *United States v. Evans*, 216 F.3d 80, 89–90 (D.C. Cir. 2000). Several of the courts applying *Richardson* to claims made on collateral review have employed the *Brecht* standard. *See, e.g., Ross*, 289 F.3d at 682; *Murr*, 200 F.3d at 906. Two courts, however, have applied the *Chapman* test to *Richardson* claims on collateral review. *See Lanier v. United States*, 220 F.3d 833, 839 (7th Cir. 2000); *Escobar de Jesus*, 187 F.3d 148, 161–62. And they both did so based on *Neder v. United States*, which held *Chapman* to apply to erroneous jury instructions. *Neder*, 527 U.S. at 3.

The *Neder* approach surely cannot be correct here though, for a couple of reasons. First, *Neder* involved a case on direct review, and as noted earlier the *Brecht* harmless error rule is the one applicable to collateral review of

---

[3] Although *Brecht* involved federal court review of a state conviction, it has since been applied to review of federal convictions. *See Dago*, 441 F.3d at 1245 (discussing *Brecht* and subsequent cases).

nonstructural constitutional errors.[4] Secondly, Neder objected to the erroneous jury instruction at trial, which entitled him to harmless error review on his direct appeal. *Id.* at 6; *see also* FED. R. CRIM. P. 51 *and* FED. R. CRIM. P. 42(b). Had *Richardson* been decided while Mr. Anderson's case was on direct appeal, *see Griffith v. Kentucky*, 479 U.S. 314, 322–23 (1989), the erroneous jury instruction would have been reviewed for plain error, *see Wilson*, 240 F.3d at 44–45, as he failed to object to it at trial. It would be nonsensical to think that Mr. Anderson is entitled to a more deferential standard of review on collateral attack than he would have been on his direct appeal. *See United States v. Frady*, 456 U.S. 152, 166 (1982) ("We reaffirm the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."). As such, the *Brecht* standard applies to this case.

Under *Brecht*, a defendant is only entitled to habeas relief when he demonstrates that a non-structural constitutional error "had a substantial or injurious effect [on] determining the jury's verdict." *Brecht*, 507 U.S. at 638. *Brecht* relied upon the Court's earlier decision in *Kotteakos v. United States*, which held that where the reviewing court was sure that the error did not influence the jury, or had only a slight effect, the verdict should stand. 328 U.S. 750, 764 (1946); *see also O'Neal v. McAninch*, 513 U.S. 432, 438 (1995) (quoting *Kotteakos*).

---

[4] *Neder* did, however, determine that erroneous jury instructions are normally non-structural constitutional errors. 527 U.S. at 8.

Here Mr. Anderson was unanimously convicted on all of the predicate offenses he was charged with. Some courts have characterized this as per se harmless error under *Richardson*. *See, e.g., United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003). While it could be the case that the jurors in this case did not agree as to which of the many offenses established the three predicate offenses for the CCE conviction, the Court finds it extremely unlikely that of the 88 offenses that could have formed the three predicate offenses for the CCE conviction, that the jury could not agree that as to at least three forming the predicate offenses. *See Santana-Madera*, 260 F.3d at 140–41. As such, even though the instruction violated *Richardson*, the Court holds the omission harmless and finds that Mr. Anderson is not entitled to relief on that basis.

*ii. Juror Unanimity as to Subordinates' Identities*

Mr. Anderson also objects to the trial court's failure to instruct the jury that they had to unanimously agree on the five identities of those persons he supervised in the continuing criminal enterprise. The D.C. Circuit considered this in Mr. Anderson's direct appeal and rejected this argument. *Anderson I*, 39 F.3d at 350. Although *Anderson I* was vacated prior to the *en banc* rehearing, the Court is convinced that its reasoning is correct. Having considered the question once before, the D.C. Circuit reached the same conclusion, though that case too was later overruled, albeit on other grounds. *United States v. Harris*, 959 F.2d 246, 254–55 (D.C. Cir. 1992). Nearly every

court presented with the question has similarly agreed that § 848 does not require unanimity as to identity of the supervisees. *See, e.g., United States v. Harris,* 209 F.2d 156, 160 (2d Cir. 2000); *United States v. Moorman,* 944 F.2d 801, 803 (11th Cir. 1991); *United States v. English,* 925 F.2d 154, 159 (6th Cir. 1991); *United States v. Linn,* 889 F.2d 1369, 1374 (5th Cir. 1989); *United States v. Jackson,* 879 F.2d 85, 88 (3d Cir. 1989); *United States v. Tarvers,* 833 F.2d 1068, 1074-1075 (1st Cir. 1987); *United States v. Markowski,* 772 F.2d 358, 364 (7th Cir. 1985). (In fact although the panel in *Anderson I* cited the D.C. Circuit's opinion in *Harris* to reject Mr. Anderson's argument, it also cited the opinions of six other circuits that had done the same. 39 F.3d at 350 n. 14.) In one case, however, the Ninth Circuit held that where a jury was presented with a group of people, some of whom could not have been supervisees, the defendant was entitled to a jury instruction requiring unanimity to the identity of the five supervisees. *United States v. Jerome,* 942 F.2d 1328, 1331 (9th Cir. 1991). Although the Ninth Circuit later held that a unanimity instruction as to the identity of supervisees was not required in another case, it still recognized that one should be required where a "genuine possibility of juror confusion exists" as to the identity of the subordinates. *United States v. Garcia,* 988 F.2d 965, 969 (9th Cir. 1993).

Mr. Anderson similarly argues that of the eleven people the government argued were potentially supervisees, some could not have been properly classified as Mr. Anderson's subordinates. However, Mr. Anderson

only offers a cursory explanation as to why he could not have supervised one of the eleven potential subordinates. Rather than refute Mr. Anderson's contention, the government has responded that *Anderson I* is the law of the circuit and the law of the case, and since that decision rejected Mr. Anderson's claim, he should not be allowed to relitigate it here. *Opposition* at 11.

Mr. Anderson correctly notes that *Anderson I* was vacated by the D.C. Circuit and as such it is not binding. *See United States v. Weathers*, 186 F.3d 948, 953 n.4 (D.C. Cir. 1999) (discussing *Anderson I*). And although the vacated opinion is no longer the law of the case, the Court still feels the logic of the prior decision in *Anderson I* mandates its reasoning be accepted and its outcome followed. *Cf. Action Alliance of Senior Citizens of Greater Phila. v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991); *City Stores Co. v. Lerner Shops of Dist. of Columbia*, 410 F.2d 101, 1014 (D.C. Cir. 1969). Were the question to reach the Court of Appeals again, it would likely be decided in the same manner as it was in *Anderson I* and *Harris*. *See also United States v. Williams-Davis*, 90 F.3d 490, 509 (D.C. Cir. 1996) (rejecting claim of required unanimity as to the identities of subordinates based on *Harris*). Additionally, nothing in *Richardson* mandates such a requirement, in fact, it suggests just the opposite. *See United States v. Short*, 181 F.3d 620, 624 (5th Cir. 1999) (discussing *Richardson*). As the explicit reasoning of the D.C. Circuit has not been disturbed, even if the opinions containing it have been, and all the other

circuits have reached similar conclusions, the Court does not agree with Mr. Anderson that the district court erred when it did not instruct the jury that it had to unanimously agree as to the identity of the supervisees. Accordingly, Mr. Anderson is not entitled to relief on this ground.

### iii. Relatedness Instruction

Lastly Mr. Anderson contends that the jury instructions were deficient because they failed to require the jury to find that the predicate violations were related to one another. *Motion* at 8. In its opposition the United States noted that this is the first time that Mr. Anderson has made this claim. *Opposition* at 8. Accordingly, Mr. Anderson may only obtain relief on this claim if he can demonstrate cause and prejudice for his failing to raise it either at trial or on direct appeal. *Frady*, 456 U.S. at 167; *see also Reed v. Farley*, 512 U.S. 339, 354 (1994).

Mr. Anderson claims that he did not have a basis for raising this claim prior to *Richardson*. Although *Richardson* nowhere makes mention of the need for the violations to be related to one another, this Circuit recognized two years prior to *Richardson* that a "continuing series of violations" means "at least three related felony narcotics violations." *United States v. Hoyle*, 122 F.3d 48, 50 (D.C. Cir. 1997) (citing *United States v. Hall*, 93 F.3d 126, 129 (4th Cir. 1996)[5]; *see also United States v. Edmonds*, 80 F.3d 810, 814 (3d

---

[5] *Hall* was abrogated by *Richardson* itself, as the Fourth Circuit later observed in *United States v. Brown*, 202 F.3d 671, 699 (4th Cir. 2000). Although the jury instructions reviewed in *Hall* actually required a finding of unanimity as to the

Cir. 1996). Like *Richardson, Hoyle* was decided after Mr. Anderson was first sentenced, as well as after his first two appeals, which would still make the failure to raise such an argument plausible. However, at the time of Mr. Anderson's trial other courts had already defined the term "continuing series" to require that the three predicate violations be related to one another. *See, e.g., United States v. Apodaca*, 843 F.2d 421, 427 (10th Cir. 1988); *United States v. Jones*, 801 F.2d 304, 307 (8th Cir. 1986); *United States v. Sinito*, 732 F.2d 1250, 1261 (6th Cir. 1983).

Where a claim is so novel that its legal basis is not reasonably available to counsel, it may constitute cause for failing to raise it. *Bousley v. United States*, 523 U.S. 614, 622 (1998). Here, however, the concept of the relatedness had been percolating in other federal courts for quite some time before Mr. Anderson's trial, and it had not been rejected in this circuit. Furthermore, there is no reason to think that requesting such an instruction would have been futile, as the Court of Appeals later accepted the exact definition Mr. Anderson now seeks in *Hoyle*. But even had the jury been instructed accordingly, it likely would not have changed the outcome of their verdict as the government put on evidence of Mr. Anderson's wide-ranging drug distribution network, from which one could only infer that the predicate offenses were related. Because the argument Mr. Anderson raises for the first time here was not novel, he has not established cause for his failure to

predicate offenses, the Fourth Circuit described the instruction as "more generous . . . than the statute requires." 93 F.3d at 129.

bring it at trial or on his direct appeal. As such, he cannot obtain relief on this ground either.

## B. Ineffective Assistance of Counsel Claims

After his indictment, Mr. Anderson was offered a plea deal by the government. The agreement would have required Mr. Anderson to plead guilty to the continuing criminal enterprise count and testify against his codefendants or others in any trial where the United States deemed it necessary. In exchange the government would drop all the remaining counts of the indictment.

Mr. Anderson alleges that during plea negotiations his attorney informed him that the penalty for this count would result in a minimum twenty year sentence, but in all likelihood he would receive a sentence closer to life imprisonment. *Motion* at 9. Because of his counsel's representation, Mr. Anderson says he rejected the government's offer and decided to go to trial. He now alleges that his counsel's assistance was ineffective because he was not correctly informed that the statutory penalty at the time of his offense was actually ten years to life rather than twenty years to life. Had he been correctly advised by his counsel, Mr. Anderson claims he would have pleaded guilty. Mr. Anderson's counsel has responded that he did not misinform the defendant of the penalty and that he knew the statutory minimum punishment for violating 21 U.S.C. § 848 was ten years. Both are wrong.

The continuing criminal enterprise Mr. Anderson operated ran from at least October 10, 1988 until May 15, 1989. At the time Mr. Anderson began the enterprise, the minimum statutory penalty for 21 U.S.C. § 848 was indeed ten years imprisonment. The statute was amended, however, on November 18, 1988 and the minimum penalty was increased to twenty years. *See United States v. Pace*, 898 F.2d 1218, 1237 n.7 (7th Cir. 1990). A sentence that is increased by statute during the period a crime is committed may be applied without violating the ex post facto clause so long as the crime continued past the date of the enactment. *Williams-Davis*, 90 F.3d at 511. Because the continuing criminal enterprise continued past the date the statute was amended, 20 years imprisonment was indeed the minimum statutory punishment available.

In order to prevail on an ineffective assistance of counsel claim, Mr. Anderson would have to make a showing that counsel's errors were so serious that they deprived him of his right to counsel as guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). This means that counsel's conduct must have fallen below an objectively reasonable standard, that is, it must have been below prevailing professional norms. *Id.* A lawyer does not meet the objectively reasonable standard if, while advising a client to take a plea offer, he fails to apprise his client of the likely sentence by making a plainly incorrect estimate due to his ignorance of the applicable law of which he should have been aware. *United States v.*

*Booze*, 293 F.3d 516, 518 (D.C. Cir. 2002); *see also United States v. Hanson*, 339 F.3d 983, 990 (D.C. Cir. 2003). Grossly underestimating a defendant's sentence exposure also constituted constitutionally deficient representation. *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004); *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998). Furthermore, lawyers must be familiar with the guidelines in order to provide effective representation. *United States v. McCoy*, 215 F.3d 516, 518 (D.C. Cir. 2000).

To succeed, Mr. Anderson must also prove—in addition to showing the error of counsel—that there was a reasonable probability the outcome of his case would have been different but for counsel's errors. *Hill v. Lockhart*, 474 U.S. 52, 57–58 (1985). A "reasonable probability" is one "sufficient to undermine confidence" in the defendant's decision to plead or, in this case, not to plead guilty. *United States v.* McCoy, 215 F.3d 102 (D.C. Cir. 2000); *see also United States v. Bowie*, 198 F.3d 905, 908–909 (D.C. Cir. 1999) (observing reasonable probability does not have to be greater than 50.01 percent). A court may dispose of an ineffective assistance claim, if the petitioner is unable to make such a showing, without deciding whether counsel was constitutionally ineffective. *Strickland*, 466 U.S. at 697.

The Court does not pass on whether Mr. Anderson received constitutionally inadequate counsel, because, based on the testimony at the evidentiary hearing along with the transcripts from the original trial and the record in this case, Mr. Anderson has failed to demonstrate with reasonable

probability that the outcome of his case would have been different but for his counsel's advice—whatever that might have been. This is because at the hearing Mr. Anderson consistently maintained that he would not have testified against his wife, Beverly Nelson. The only documented plea offer has no exception that would have permitted Mr. Anderson not to testify against Ms. Nelson had he been asked to do so by the government. And throughout the hearing Mr. Anderson never wavered in his position that he would not have testified against Ms. Nelson. And Mr. Anderson has failed to adduce any evidence—beyond his own, self-serving testimony—that the government would have offered him such an agreement.

Mr. Anderson also maintains that even if the Court finds that there was no reasonable probability he would have accepted a cooperation agreement, his lawyer's constitutionally deficient advice prevented him from pursuing a wired plea deal with Ms. Nelson and that there is a reasonable probability the government would have proffered such a deal and that he and Ms. Nelson would have accepted.

One reference frequently cited by both parties from the trial transcript indicates that Mr. Anderson did seek out a negotiated disposition shortly after his arrest, and it also makes clear that the government was aware that he was attempting to do so for the benefit of his wife.[6] This portion of the

---

[6] That portion of the transcript reads in full as:

trial transcript indicates several things about the plea negotiations in this case. First it appears that any plea negotiations that took place on the day of Mr. Anderson's arrest were the result of his initiating them, rather than the government offering him a plea deal off the bat. Secondly, even if a plea offer was made at that time—which is not certain from the transcript—there was some impediment to Mr. Anderson's accepting it. What that impediment was isn't clear. It might have been that the government was unwilling to reduce the charges against Ms. Nelson, and so Mr. Anderson found the deal unpalatable. It could have been that he received ineffective assistance from his counsel that persuaded him the negotiations were not in his interest. In any case, the record also suggests that it was Mr. Anderson's decision to break off negotiations.[7]

---

Mr. O' Malley: Your Honor, I just want Mr. Hill to know that in the government's view, he's opened the door. This was a two and a half hour session, for an hour and a half of which he had an attorney appointed to him by the Court.

   \* \* \*

Mr. O' Malley: --An hour and a half of which he had an attorney appointed for him by the Court, Mr. Virgilio, and during that session Mr. Anderson was actively – and he initiated it – actively negotiating for a plea arrangement. He was prepared to plead guilty, and Mr. Hill knows this. I told him that, and Mr. Hill sits here and characterizes this conversation as though it was a tense conversation in which he was under a lot of pressure, in which he was out of control. This was a session Mr. Anderson initiated. It was Mr. Anderson, who wanted to negotiate and, frankly, he wanted to negotiate because he wanted to get a reduction in charges for Ms. Nelson, and during that conversation it was I who insisted he get an attorney. . . .

[7] That portion of the transcript reads as follows:

Mr. O' Malley: [O]n the date of his arrest the United States entered into negotiations with Mr. Anderson almost immediately, and during those negotiations

Still, whatever caused these plea negotiations to break down, it remains Mr. Anderson's burden to prove that there was a reasonable probability the outcome of his case would have been different, and that starts by demonstrating that there was a plea offer at the time. *See United States v. Mathis*, 503 F.3d 150, 152 (D.C. Cir. 2007).

One way that Mr. Anderson could have done this was by obtaining an affidavit from Mr. Virgilio, his court-appointed lawyer immediately after his arrest. Mr. Anderson could have also called Mr. Virgilio as a witness at the evidentiary hearing. He did neither. Likewise Mr. Anderson could have sought discovery from Mr. O' Malley, but again he did not. And although Mr. O' Malley's statement at trial indicates that plea negotiations took place on the day of Mr. Anderson's arrest, it does not indicate that a plea deal was ever agreed upon, or what the terms of that deal, if it existed, were.

Mr. Hill, on the other hand, testified that he was unclear about when he began to represent the defendant in this case, and thought it was sometime after his arrest. He had no recollection of whether he was present during the plea negotiations after the arrest or what the terms of a plea offer were. Again, Mr. Anderson could have sought out testimony from Mr. Virgilio and Mr. O'Malley to corroborate his testimony that Mr. Hill met him

---

Mr. Anderson was represented by counsel who was appointed by this Court—by this Court I mean Magistrate Dwyer—and Mr. Anderson broke off those negotiations when Mr. Anderson may have been of value to the United States with respect to the investigation and prosecution of other persons and he thereafter by his feigned mental problems or mental illness or mental incompetency made any ability to enter into cooperation impossible and frustrate it totally. . .

at the FBI office on the day of his arrest, but did not. Indeed, the two references to the plea negotiations on the day of the arrest only reference the court appointed attorney, which suggests that Mr. Hill's recollection was correct and that he was not present. *See supra* notes 6 & 7. Furthermore those references in the record to the negotiations on the day of his arrest suggest an agreement was never reached. *Supra* note 7 ("Mr. Anderson broke off those *negotiations. . . .*") (emphasis added). In sum, the only evidence the Court has that there was a plea offer or what its terms were is that presented by Mr. Anderson himself, and as a number of courts have noted, such self-serving, uncorroborated testimony is not enough to establish a finding of reasonable probability. *See United States v. Day*, 969 F.3d 39, 45 (6th Cir. 1992) (collecting cases). Since Mr. Anderson has produced no objective evidence that he was offered a plea agreement at the stage—indeed he has only established that plea negotiations took place—he has not established the demonstrated prejudice as required by *Strickland*.

Eventually the government did offer Mr. Anderson a deal. But even if the Court were to construe the government's written plea offer as objective evidence that corroborates Mr. Anderson's testimony, he has still failed to demonstrate prejudice, as he not produced any evidence (other than his own testimony) of what the terms of that initial "deal" were. Although Mr. Anderson testified that the deal he negotiated on the day of his arrest did not require his cooperation, the written offer suggests that the government was

not amenable to a noncooperation agreement. And Mr. Anderson made clear that he would not have cooperated against Ms. Nelson, which is something the deal could have required him to do.

Likewise, Mr. Anderson cannot demonstrate any prejudice regarding the written plea offer—which he claims he was never informed of—because the terms on which that deal were offered were ones he was adamant that he would not accept. That is, the deal required him to cooperate against any and all of his codefendants including Ms. Nelson. While at the hearing he testified that he would have cooperated against codefendants other than Ms. Nelson, he was steadfast that he would not have cooperated against her. Likewise, he has produced no evidence that the government would have offered him a more favorable deal, that is, one that would not have required him to cooperate against Ms. Nelson, then or earlier.

In the alternative Mr. Anderson argues that his counsel's deficient advice prevented him from seeking a wired plea deal with Ms. Nelson, and that the government would have agreed to such an arrangement. Mr. Anderson has presented evidence that the government was willing to plea bargain with him, first through its willingness to negotiate after his arrest, and later through its extension of a written plea offer. In *United States v. Gordon* the Second Circuit stated that a defendant is prejudiced if he lacks accurate information about sentencing on which he can decide whether to pursue further plea negotiations. 156 F.3d at 380. Mr. Anderson seems to

suggest in his brief that this is per se prejudicial. That conclusion, however, would not square with *Strickland* or even with *Gordon*. While it is undoubtedly true that a defendant is disadvantaged if he does not have accurate information upon which to consider engaging in plea negotiations, for the purposes of *Strickland* it only matters to the extent that disadvantage could be said to affect the outcome of the proceedings. *See id.* ("Accordingly, Gordon suffered prejudice if his reliance on Dedes' advice *affected the outcome of the proceedings*.") (emphasis added).

Many dominoes would have to fall for Mr. Anderson to succeed on this claim, but the Court can address it by beginning at the end. In addition to showing that the government would have considered wired pleas, to prevail requires that Mr. Anderson not only show a reasonable probability that he would have accepted a wired plea, but also that Ms. Nelson would have. *See United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C. Cir. 1997). The defendant has presented no evidence regarding Ms. Nelson's willingness to accept a wired plea offer. This is in addition to his failure to present evidence that the government would have offered a wired plea offer. This could have been done by calling Ms. Nelson to the stand or Mr. O' Malley, or better yet, by offering objective evidence, like a written plea offer to Ms. Nelson. But the defendant did not put on this sort of evidence. Though the Court is unaware of whether any plea offer was ever extended to Ms. Nelson, it is clear that if one was offered, she did not accept it, as she went to trial and was sentenced

to a term of 151 months followed by five years of supervised release. Although the standard of reasonable probability is not a high one—though it becomes more difficult the more attenuated a claim is—for the Court to find Mr. Anderson was prejudiced it needs something more than wishful thinking. But on this last claim, that is all the Court has, and as such it cannot find that Mr. Anderson has demonstrated prejudice under *Strickland*.

Because Mr. Anderson cannot demonstrate prejudice as required by *Strickland*, his ineffective assistance of counsel claim is denied.

## C. Ex Post Facto Claims

Mr. Anderson was also sentenced to a 364-month sentence for possession with intent to distribute cocaine base. None of Mr. Anderson's co-defendants were charged in this count. At the time Mr. Anderson was first sentenced it was inappropriate to make an upward adjustment for someone's role as an organizer if only that one person had been charged. *See United States v. Williams*, 891 F.2d 921, 925 (D.C. Cir. 1989). A subsequent amendment to the sentencing guidelines, which took effect on November 1, 1990, allowed a sentencing judge to look beyond the indictment to the underlying scheme for the purpose of sentencing. *United States v. Cabellero*, 936 F.2d 1292, 1298 (D.C. Cir. 1991). When Mr. Anderson was resentenced on December 4, 1997, following his first set of appeals, the sentencing judge applied the guidelines, as "clarified" by the later amendment, which resulted in a four-level upward adjustment. However, that upward departure violates

the ex post facto clause because the application of the clarifying amendment resulted in a greater sentence than would have been permitted at the time the defendant committed his crimes. *See United States v. Seals*, 130 F.3d 451, 463 (D.C. Cir. 1997).

After his resentencing, Mr. Anderson objected to the district court's upward departure, though not on the basis that it violated the ex post facto clause, but rather on the grounds that an upward enhancement for his role as an organizer on the possession-with-intent-to-distribute count would violate the Fifth Amendment's double jeopardy clause because he had already been convicted as an organizer under 21 U.S.C. § 848. The Court of Appeals rejected this argument based on *Witte v. United States. Anderson III*, 172 F.3d 921. And Mr. Anderson did not raise his ex post facto argument on direct appeal.

The government argues that Mr. Anderson is procedurally barred from bringing this claim on collateral review. While Mr. Anderson correctly states that you are not absolutely prevented from bringing a claim on collateral review that was not raised in a direct appeal, failure to do so certainly makes it a lot harder. Failure to raise an issue that could have been brought on direct appeal bars a petitioner from asserting it on collateral review, unless a petitioner can establish cause and prejudice for his failure to do so. *Bousley v. United States*, 523 U.S. 614, 622 (1998).

Mr. Anderson, however, has not demonstrated cause. In making his argument, Mr. Anderson principally relies on *United States v. Seals*, 130 F.3d 451, 463 (D.C. Cir. 1997). *Seals* was decided on December 5, 1997—the day after Mr. Anderson was resentenced. Petitioner did not file his appellate brief until June 22, 1998. Even though *Seals* was decided the day after he was sentenced, Mr. Anderson's counsel had ample time to incorporate its holding into his appeal. Since the argument was reasonably available to counsel, Mr. Anderson has not demonstrated cause for his failure to raise it on direct appeal. *Cf. Bousley*, 523 U.S. at 622. There is no other suggestion as to why Mr. Anderson might have had cause for not raising this issue before. Since Mr. Anderson has not demonstrated cause for failing to bring this argument on his direct appeal—though he would be entitled to relief had he—he is procedurally barred from receiving relief here.

## III. CONCLUSION

Because Mr. Anderson has failed to raise any grounds on which this Court may grant him relief, petitioner's motion will be denied in a separate order to issue today.

April 8, 2010.

Royce C. Lamberth
ROYCE C. LAMBERTH
Chief Judge
United States District Court